In
The

                                                Court
of Appeals

                        Sixth
Appellate District of Texas at Texarkana

 

                                                ______________________________

 

                                                             No. 06-08-00220-CR

                                                ______________________________

 

 

                                RAYMOND WAIER WIRTH,
Appellant

 

                                                                V.

 

                                     THE STATE OF TEXAS, Appellee

 

 

                                                                                                  


 

 

                                       On Appeal from the 336th
Judicial District Court

                                                             Fannin County, Texas

                                                            Trial
Court No. 22758

 

                                                         
                                         

 

 

 

                                          Before Morriss, C.J.,
Carter and Moseley, JJ.

                                              Opinion on Remand by Justice Moseley








                                                         OPINION ON REMAND

 

            On
January 31, 1996, the Texas Court of Criminal Appeals issued its ruling in Clewis v. State, 922 S.W.2d 126 (Tex.
Crim. App. 1996), wherein it acknowledged that the Texas Constitution conferred
upon the courts of appeals “appellate jurisdiction, under such regulations as may be prescribed by law.  Provided, that the decision of said courts
[of appeals] shall be conclusive on all questions of fact brought before them on
appeal or error”[1]
and ruled that the authority to rule on the factual sufficiency of evidence
extended to reviews in criminal cases. 
In the Clewis case, it was
announced that the proper standard of review for factual sufficiency of the
elements of the offense to be employed by the courts of appeals, “views all the
evidence without the prism of ‘in the light most favorable to the
prosecution.’. . . [and] sets aside the verdict only if it is so contrary to
the overwhelming weight of the evidence as to be clearly wrong and
unjust.”  Id. at 129.  This factual
sufficiency review standard announced at that time was contrasted with that of
the legal sufficiency review standard set out by the United States Supreme
Court in Jackson v. Virginia, 443
U.S. 307, 319 (1979):  “whether, after
viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have
found the essential elements of the crime beyond a reasonable doubt.”  Clewis,
922 S.W.2d at 128–29.

            Based
on that distinction and employing the differing standards announced in Clewis, this Court found that although
there was legally sufficient evidence to warrant the conviction of Raymond
Waier Wirth by a jury for the charged crime of theft of $20,000.00 or more but
less than $100,000.00, the evidence was factually insufficient to support the
conviction.  Wirth v. State, 296 S.W.3d 895 (Tex. App.––Texarkana 2009), vacated & remanded,
327 S.W.3d 164 (Tex. Crim. App. 2010). 
Although our ruling in that case also dealt with the admissibility of
certain evidence and with complaints regarding venue, the sole issue raised by
the State in its petition for discretionary review dealt with the determination
that there was factually insufficient evidence to support the conviction.  

            Subsequent
to the issuance of that opinion by this Court, but before the Wirth case
was disposed of by it on appeal, the Texas Court of Criminal Appeals issued its
opinion in Brooks v. State, 323 S.W.3d 893, 894 (Tex. Crim. App.
2010).  In Brooks, the Texas Court
of Criminal Appeals took its “next small step,” whereby it ended its almost
fifteen-year flirtation with the Texas Constitution’s grant to the courts of
appeals of the exclusive and conclusive duty of factual
sufficiency review, determining that there had become no meaningful distinction
between the Jackson legal sufficiency standard and the Clewis
factual sufficiency standard of review, specifically overruling Clewis.  Id. at 912.  It then vacated this Court’s judgment in the Wirth
case and remanded it to us for reconsideration, this time to take into account
the disintegration of the Clewis factual sufficiency review as announced
in Brooks.  Wirth, 327 S.W.3d at
165.  

I.          Factual Background 

            A.        The Leasing Business 

            The
charges against Wirth arose from his operation of an automobile leasing
business, a trade that had been operated by him for more than twenty years.  The business was operated under the umbrella
of two corporations with different functions: 
RW Leasing did the marketing of vehicles and Wirth Leasing, Inc.,
provided the funding sources and received one-third of the profits.  Whereas Wirth was the sole owner of Wirth
Leasing, Inc., he owned only half of RW Leasing, the other half being
owned by its sales manager, James Rogers. 
Under the business plan, the sales force made contact with persons
interested in leasing automobiles and would solicit information from those
prospective customers regarding the type of automobile they wanted to lease and
the prices they were willing to pay. 
Armed with this information, the company would locate automobiles
through dealerships to fill the customers’ needs and wants and negotiate for
the purchase of the automobiles.  Wirth
Leasing, Inc., through its contacts with several major banking institutions,
would seek approval by the bank of the customer as lessee, arrange for the
purchase of the automobiles, arrange for the transfer of the title to the
vehicle, sign the lease agreement with the customer, and then assign the lease
agreement to the financing bank.  A draft
(in this circumstance, each of which was signed by Rogers in his capacity as
the agent for RW Leasing) would be drawn on the account of RW Leasing at the
First State Bank of Prosper, Texas, and sent to the automobile dealership for
the purchase price of the vehicle, and the vehicle was delivered to the
customer.  When the funding bank received
the car title, it would electronically transfer funds into the RW Leasing bank
account at the Prosper bank; upon receipt of the funds, a check drawn on the RW
Leasing bank account was used to honor the draft presented by the dealership.  The customer made lease payments directly to
the funding bank as the assignee of the lease contract according to the terms
of the contract.  Wirth’s agreement with
the funding banks involved fees or compensation paid to his company on the
contracts that had been approved.  This
process had been in place for several years until the early part of 2005, at
which time the carefully-orchestrated scheme fell apart when at least fifteen
of the drafts (totaling over half a million dollars, each signed by Rogers in
his representative capacity) sent to automobile dealerships were dishonored and
Wirth closed the Prosper bank accounts. 
A large part of this debt was discharged by Wirth through a bankruptcy
proceeding. 

            Wirth
was indicted for theft of property over $200,000.00 in connection with the
transfer of title of the fifteen vehicles when the drafts for each remained
unsatisfied.  Allegations of theft
involved one Fannin County automobile dealership and other allegations from
other dealerships outside Fannin County, all of which were prosecuted together
as a continuing conduct or scheme.[2]  The jury found Wirth guilty of the lesser
offense of theft of $20,000.00 or more but less than $100,000.00 and assessed
punishment at ten years’ imprisonment and a $10,000.00 fine, and recommended
community supervision.  The trial court
sentenced Wirth accordingly by placing him on community supervision for five
years and ordered that he pay restitution of $128,103.27.

            B.        Argument of Wirth

            Wirth
argues there is no evidence to satisfy the mandatory criminal intent
requirement of the charged offense, maintaining that by this prosecution, the
State is attempting to reinstitute the notion of a “debtors prison” by
convicting him for failing to repay debts. 
He further argues that if any criminal wrongdoing occurred, it was not
at his hand, but at the hand of Rogers, an employee of the company.[3]  

II.        Sufficiency of the
Evidence 

            Under
the redesign of Brooks, Wirth argues that the evidence is
insufficient to support the verdict because of a lack of evidence that could
support a finding of Wirth’s intention to commit theft, a necessary element of
the charged offense.

            A.        Standard of Review

            Under
the present state of the law, in evaluating legal sufficiency, we review all
the evidence in the light most favorable to the jury’s verdict to determine
whether any rational jury could have found the essential elements of the
charged offense beyond a reasonable doubt. 
Brooks, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (citing Jackson,
443 U.S. at 319 (1979)); Hartsfield v. State, 305 S.W.3d 859, 863 (Tex.
App.––Texarkana 2010, pet. ref’d).  Our
rigorous legal sufficiency review focuses on the quality of the evidence
presented.  Brooks, 323 S.W.3d at
917 (Cochran, J., concurring).  We
examine legal sufficiency under the direction of the Brooks opinion,
while giving deference to the responsibility of the jury “to fairly resolve
conflicts in testimony, to weigh the evidence, and to draw reasonable
inferences from basic facts to ultimate facts.” 
Hooper v. State, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing Jackson,
443 U.S. at 318–19); Clayton v. State, 235 S.W.3d 772, 778 (Tex. Crim.
App. 2007).  

            In
this analysis, we continue to use a hypothetically-correct jury charge to
evaluate the sufficiency of the evidence. 
Grotti v. State, 273 S.W.3d 273 (Tex. Crim. App. 2008).  Such a charge accurately sets out the law, is
authorized by the indictment, does not unnecessarily increase the State’s
burden of proof or unnecessarily restrict the State’s theories of liability,
and adequately describes the particular offense for which the defendant was
tried.  Villarreal v. State, 286
S.W.3d 321 (Tex. Crim. App. 2009); Malik v. State, 953 S.W.2d 234, 240
(Tex. Crim. App. 1997).  Wirth does not
argue that the charge is incorrect or not one authorized by the indictment, and
it tracks the indictment and the statute that criminalizes the conduct
involved.

            B.        The Statute 

            The
jury was charged to determine whether Wirth, pursuant to one scheme or
continuing course of conduct, committed the offense of theft by intentionally
or knowingly unlawfully appropriating property by bringing about a transfer of
title (of automobiles) without the effective consent of the owners and with
intent to deprive the owners of property. 
The jury was also instructed that consent is not effective if it is
induced by deception.  Tex. Penal Code Ann. § 31.01(3)
(Vernon Supp. 2010).

            “Deception”
was defined in the charge as

promising performance that is likely to affect the
judgment of another in the transaction and that the actor does not intend to
perform or knows will not be performed, except that failure to perform the
promise in issue without other evidence of intent or knowledge is not
sufficient proof that the actor did not intend to perform or knew the promise
would not be performed.

 

Tex. Penal Code Ann. § 31.01(1)(E)
(Vernon Supp. 2010).

            C.        Underlying Events

            The evidence was that Wirth was in
charge of both businesses; Wirth Leasing had the agreements with the funding
banks.  Wirth handled bills, signed the
paychecks, hired and fired, instituted sales policies, and controlled all
financial aspects of the companies.  The
Prosper bank account manager, Penny Acker, testified that only Wirth conducted
banking on behalf of both companies and that she dealt with no other person
from either company, that he was the person notified when a draft arrived, and
that he was the only person to send payment to cover the drafts.  In January and February 2005, some drafts
written to the automobile dealerships failed to be honored.  Specifically, Toyota of Lewisville received
eight drafts which were dishonored; the dates of the drafts were between
January 31, 2005 through February 18, 2005. 
At about the same time, Park Place Motorcars in Dallas presented three
drafts within thirty days, none of which were honored.  McKinney Dodge had two unpaid drafts; Bonham
Chrysler received one unpaid draft dated January 19, 2005; Lexus of Clear Lake
had an unpaid draft and contacted Wirth, who sent a check (also returned
unpaid) on the RW Leasing account.  All
of the witnesses from the automobile dealerships testified that they
transferred possession and title to the vehicles, were not paid on the drafts,
and were unable to regain possession of the vehicles.  (Title had been transferred by the dealers to
the respective funding banks.)  Likewise,
the evidence showed that for each of these transactions, the funding bank
approved the lease contracts with the Wirth sales force, and funds to honor the
drafts were paid by those banks into the RW Leasing account at the Prosper
bank.  The total amount of these fifteen
unpaid drafts amounted to over $500,000.00. 
Bank records were introduced, but none of the withdrawals to the Wirth
companies have been shown to be something other than ordinary business
transactions.  On March 5, 2005, the
RW Leasing bank account was closed by Wirth and the balance of $41,813.27
was withdrawn. 

            D.        Criminal Intent

            In
summary, Wirth argues that the evidence is not such as would allow a jury to
infer that he had the intent to steal, but rather his argument is that his
business simply failed.  There is
evidence that Wirth was a profligate spender and that when the business began
its precipitous death spiral, he first juggled funds and then ran far short of
the necessary monies to satisfy the drafts. 
However, although the denouement of the business was rather
spectacularly unsuccessful, it had earned a considerable amount of money over
an extended multi-year period of time. 
There is no doubt that the “money well” ultimately ran dry and that
Wirth filed for bankruptcy.  There is no
doubt that Wirth behaved poorly and, perhaps, illegally in his relationship
with Amegy Bank and that his conduct toward a longtime employee may have been
(at best) self-serving and dishonorable.[4]  However, the prosecution before this Court
concerns neither of those actions, but whether there is sufficient evidence to
allow a jury to determine that he had the intent to steal at the time that he
obtained the moneys which were intended to be used to satisfy the drafts.

            As
previously stated, Wirth’s conviction is pursuant to a Texas Penal Code
provision that criminalizes taking funds from another without their effective
consent.  (Consent is not effective if
induced by deception.  Deception includes
promising performance which the promisor does not intend to perform or knows
will not be performed.)  The statute also
states that failure to perform, standing alone, is not sufficient proof.  Tex.
Penal Code Ann. § 31.01 (Vernon Supp. 2010). 

            The
statute and the hypothetically-correct jury charge analysis require the State
to prove  that Wirth did not intend to
honor the drafts or knew they would not be honored when the drafts were
issued.  Further, failure to honor the
drafts, without other evidence of intent or knowledge, is not sufficient proof
that Wirth did not intend to perform or knew the drafts would not be
honored.  The State argues that the
evidence supporting the finding is: 

(1)        Wirth
owned Wirth Leasing and controlled RW Leasing and was solely in charge of the
banking and financial aspects of the business. 


(2)        Acker,
a banker at the Prosper bank, told Wirth there were insufficient funds to cover
his drafts and, yet, he continued business as usual.  

(3)        The
automobile dealerships took measures to attempt to collect on the drafts, to no
avail. 

(4)        Wirth
blamed others and denied involvement.  

(5)        His
opulent lifestyle showed he “used other people’s money for his own personal
benefit without their permission.”  

(6)        His
dishonesty with Amegy Bank on an unrelated matter showed intent to steal from
the car dealers.

            This
Court has previously noted that a claim of theft made in connection with a
contract requires proof of more than an intent to deprive and a subsequent
appropriation of the property.  If only
an intent and appropriation are present in a contractual matter, there is no
criminal conduct because under the terms of the contract, one has the right to
“deprive the owner of property” in return for consideration.  Baker v. State, 986 S.W.2d 271, 274
(Tex. App.––Texarkana 1998, pet. ref’d). 

            We
recognize that criminal intent may be (indeed, typically must be) inferred from
the nature of the actions taken. 
Further, mental states are almost always inferred from acts and words.  The mental culpability of a defendant is of
such a nature that it generally must be inferred from the circumstances in
which a prohibited act or omission occurs. 
A mental state is concealed within the mind of an individual, and can
only be determined from his words, acts, and conduct.  Moore v. State, 969 S.W.2d 4, 10 (Tex.
Crim. App. 1998).  We, therefore, examine
the State’s arguments and the surrounding circumstances for evidence from which
a jury could draw the conclusion that Wirth did not intend to honor the drafts
or knew the drafts would not be paid when they were issued.

                        1.         Testimony of Penny Acker

            Acker,
an employee of the bank in Prosper where the company’s checking accounts were
maintained, testified that in the early days of the account, it was flush with
money to cover the drafts, but that began changing about four or five months
before Wirth closed the account in 2005. (i.e., December 2004 through early
March 2005).  At that point, there began
to be insufficient funds in the account to cover the drafts, and the Prosper
bank began returning some of the drafts unpaid. 
Acker testified that she thought Wirth might be kiting[5] funds
and, based on that suspicion, the bank began holding some deposits until they
cleared the bank on which they were drawn. 
Acker’s specific testimony was that in November 2004, the RW Leasing
bank account had twelve insufficient fund check charges.  She did not speak to Wirth about this, but
notified a vice president, who she believed had a meeting with Wirth, at which
time Wirth appeared to become agitated, but she did not know if the issues she
had been observing were discussed.  When
asked if Wirth was aware that drafts were outstanding at the time he closed the
bank account, Acker stated, “As far as I can remember, I think we had a
couple.”  Later, the following exchange
occurred:

Q.        Just
two questions, Ms. Acker.  Going back to
the question about the account’s [sic] closed and a bank is sending a draft
money, and if Mr. Wirth instructed you as you’ve said -- when the account’s
closed, to send those back -- 

 

A.        He
didn’t instruct us to send it back.  I
mean --

 

Q.        I’m
sorry.  I misunderstood your testimony .
. . .

 

There is no showing by this testimony that
Wirth was made aware that the drafts were still outstanding when he closed the
bank account.  The testimony showed that
these events occurred some time after the drafts had already been issued and
the vehicles had been delivered; therefore, it did not serve to prove up
Wirth’s intent to deceive at the time the drafts were issued and the property
was appropriated.  We must reiterate that
the relevant intent to deprive the owner of property is the accused’s intent at
the time of the taking.  Peterson v.
State, 645 S.W.2d 807, 811 (Tex. Crim. App. 1983) (citing Griffin v.
State, 614 S.W.2d 155 (Tex. Crim. App. 1981)).  “In sum, the State must show a rational
fact[-]finder could have found appellant had no intention of fulfilling his
obligation under the agreement, and his promise to perform was ‘merely a ruse
to accomplish theft by deception.’”  Jacobs
v. State, 230 S.W.3d 225, 230 (Tex. App.––Houston [14th Dist.] 2006, no
pet.) (quoting King v. State, 17 S.W.3d 7, 15 (Tex. App.––Houston [14th
Dist.] 2000, pet. ref’d)).

                        2.         Personal Gain 

            Another consideration in determining
whether Wirth had criminal intent is whether he experienced personal gain from
the property obtained.  Christensen v.
State, 240 S.W.3d 25, 33 (Tex. App.––Houston [1st Dist.] 2007, no
pet.).  In this case, the State
introduced Wirth’s bank records, but has not directed this Court to any
instances in them of Wirth withdrawing funds for his personal gain.  No attempt was made to show that any Wirth Leasing,
Inc., withdrawal was not a proper business item.  Instead, the State’s argument proceeds from
the premise that the funding banks placed money in the RW Leasing account for
each draft representing a vehicle transaction and Wirth expended large sums of
money for housing, vehicles, and recreational property and lived an “opulent”
lifestyle.  Based on those two facts, the
State argues that the jury could reasonably infer that Wirth intended to
deceive various automobile dealerships when he had no intent to pay or knew the
drafts would not be paid, all to support his luxurious lifestyle.  

            However,
the evidence also shows that Wirth’s business had produced substantial revenue
for many years, which had apparently been sufficient to support an abundant
lifestyle (according to Wirth’s proposal, the business had gross profits of
$651,179.02 for the first nine months of 2004). 
Further, such a conclusion requires a considerable stretch of logic.  The fact that Wirth lived in high style could
reasonably lead to an inference that he had access to sufficient funds to
support it, not that he intentionally issued drafts with the simultaneous
awareness that they would not be paid. 
We must remember that Wirth was not charged with living beyond his
means; if that were a crime, a substantial part of the American populace would
be subject to being firmly ensconced behind bars.

            Both
Wirth and Rogers were authorized to write checks or make withdrawals from the
RW Leasing bank account.  Ultimately,
Wirth lost his business of many years and declared personal bankruptcy. 

            E.        Extraneous Bad Acts

                        1.         Amegy Bank Transaction (Testimony of
James Bloodgood) 

            The
State also argues that evidence of Wirth’s intent to deceive is shown by the
testimony of James Bloodgood, a vice-president of Amegy Bank, regarding a
business transaction with Wirth that is unrelated to this prosecution.  Wirth complained this evidence was
inadmissible, citing Rule 404 of the Texas Rules of Evidence.  See Tex.
R. Evid. 404.  In our previous opinion,
we ruled this evidence to have been admissible; since no appeal was taken
regarding that issue, it is a final ruling.

            Reiterating
that evidence, the record shows that Bloodgood testified to a sequence of
overdrafts in two of Wirth’s accounts with that bank and opined that he,
likewise, suspected Wirth of kiting. 
Bloodgood testified that he ultimately asked Wirth to liquidate
securities that were partially used as collateral on a $50,000.00 line of
credit toward the end that the overage (about $36,000.00) could be applied
toward the uncollected portion of Wirth’s accounts.  Bloodgood stated that he had released the
securities for that purpose.  (Wirth
maintained several accounts there:  one
for another of his companies, Certified Vehicle Leasing, and another for Wirth
Leasing, as well as personal accounts.) 
There is evidence that a form used by Bloodgood for the release of the
security interest which was signed by him February 10, 2005, was altered after
it was in Wirth’s possession.  After the
securities were sold, the funds thus realized were not applied to the debt at
Amegy Bank, but were, instead, transmitted to Wirth’s personal account and then
deducted by him from that account via a series of cashier’s checks from a
different branch.  This occurred during
the three-month time frame during which the drafts involved with this
prosecution were issued.  Bloodgood
testified that his bank was ultimately unable to collect on the line of credit
and lost an additional $41,000.00 as a result of the uncollected fund
transfers.  Evidence showed that Wirth
misled Bloodgood into thinking he would liquidate his securities to pay the
loan to Amegy Bank.  Then, according to
Bloodgood, Wirth managed to sell the previously secured stocks and have the
proceeds from their sale transferred to his own account without satisfying the
bank loan which had been secured by them. 
Logically, if this evidence is relevant on the issue of intent, it is
some evidence from which a jury could infer that Wirth did not intend to honor
the drafts at the time they were issued or that he knew they would not be
honored.  

            Reviewing
the evidence for legal sufficiency pursuant to the plurality opinion in Brooks,
we defer to the responsibility of the jury to resolve conflicts, weigh evidence,
and draw reasonable inferences, but we are also aware that we must review the
evidence rigorously in order to fulfill our duty as a reviewing court, which
(by necessity) includes a focus on the quality of the evidence presented.  Brooks, 323 S.W.3d at 917.  

            As
we have previously outlined, the evidence that we found that constituted “some
evidence” sufficient under Clewis
to allow the
jury to infer the issue of intent was the testimony concerning the other bank
transaction.  However, under the rigorous
review now required under the proper sufficiency analysis, the existence of any
evidence is not determinative of whether the evidence is sufficient to allow a
rational jury to find Wirth guilty beyond a reasonable doubt.  When we look at that transaction, we find
that it is substantially dissimilar to the allegations of deception lodged
against Wirth by this indictment.  In the
Bloodgood testimony, it is suggested that Wirth manipulated Bloodgood and his
bank into signing a form that later was altered.  Since the document was in Wirth’s possession,
and since the document’s alteration allowed him to receive the funds without
paying the bank loan, the implication is that he either altered it himself or
caused it to be altered.  If this
allegation is true, Wirth deliberately took affirmative actions which resulted
in his improperly receiving the funds. 
That misconduct, however, is no part of the charges for which Wirth was
on trial. 

            Wirth’s
dealings with the banks and automobile dealerships in connection with the
drafts are not analogous to his dealings with Amegy Bank.  As previously noted, drafts issued to the
automobile dealerships were integral to the same procedures previously followed
many times in the regular course of a business that Wirth had successfully
conducted for many years.  No
irregularity (such as the alteration of commercial instruments) was shown in
any of the transactions which are the heart of the State’s case against Wirth.  The drafts were signed by Rogers, who had
handled these transactions for years; the lease contracts were approved by the
funding banks; the money was sent to the leasing bank account; and, except for
the fifteen drafts executed just before the business collapsed in a heap,
drafts issued in the same manner had been honored by Wirth’s business for a
period of years.  For 2004, the company
was issuing and honoring at least thirty to forty such drafts every month.  While there is no explanation as to why the
funds to pay for the drafts dissipated over a period of time, we have not been
directed to any evidence of Wirth personally raiding the bank account to any
greater extent than he had done before, when the business was successful.  We have previously concluded that the
evidence of the Bloodgood incident was admissible, albeit with some
misgivings.  However, there is a complete
absence of any evidence from which an inference could be drawn that might show
that the Amegy Bank incident involving Bloodgood had a place in some grand plan
or scheme to steal or defraud.  In the absence
of some perceptible and reasonable linkage with such, we find its probative
value to support a reasonable inference that Wirth had the necessary intent not
to honor the drafts to be weak and insubstantial. 

                        2.         The Rogers Insurance Policy 

            Wirth
also complained of the admission of testimony from Rogers about Wirth’s
liquidation of what Rogers testified was an insurance policy that represented
his retirement account.  We recount that
testimony (much in the same form as our original opinion issued in this case)
to aid in understanding the issue of sufficiency.  Rogers testified that Wirth had purchased a
life insurance policy designed to compensate Wirth if Rogers died while
employed, with half the benefits to Wirth and half to Rogers’ wife.  However, if Rogers retired, he was then to
receive the cash value of the policy as his retirement benefit.  Rogers went on to state that Wirth cashed in
the life insurance policy and gave none of the proceeds to Rogers, this
occurring at about the same time of the Amegy Bank transaction.  As with the Bloodgood evidence about the
Amegy Bank transaction, the State also argued that this evidence showed Wirth’s
intent to deprive another of property which he formed or possessed at or about
the same time the fraudulent drafts were issued.  

            In
our previous opinion in this case, we ruled that Wirth’s actions concerning the
Rogers insurance policy was not sufficiently similar to the offense with which
Wirth was charged to have been relevant to the issue of Wirth’s mens rea
with regard to the crime with which he had been charged.  Therefore, it did not meet the measure of
being a similar transaction as contemplated pursuant to Section 31.03(c)(1) of
the Texas Penal Code and was, therefore, inadmissible as evidence.  Tex.
Penal Code Ann. § 31.03(c)(1) (Vernon Supp. 2010).  However, although we determined this evidence
to have been inadmissible, we also deemed it to have been harmless error. 

            F.         Closing the Account 

            Finally,
the State argues that Wirth’s closing of the account and withdrawing $41,000.00
also proves his intent to deceive.  But
the intent to deceive must have occurred at the time the drafts were written.  Does the fact that Wirth withdrew $41,000.00
evidence his intent that when Rogers issued drafts on approved contracts, Wirth
intended that these drafts would not be honored?  Although failing to pay those drafts was a
violation of his contract, it was also a diversion from his prior business
practices, which is perhaps revelatory of a character flaw and certainly
demonstrative of bad business practices; however, it does not evidence Wirth’s
intention to create and deliver drafts that he would then refuse to pay.  There simply is no evidence when these drafts
were issued by Rogers on approved contracts, that Wirth possessed the intention
at that time to dishonor them or that he knew they would not be honored when
they were issued. 

III.       Conclusion 

            We
have discussed each of the items of evidence that the State put forward to
support its position that Wirth deceived the automobile dealers by promising a
performance that he did not then intend to keep or that he then knew would not
be performed.  The only connection
between the extraneous alleged bad acts and the charged offenses is that Wirth
was involved in those acts, that appropriation of money was involved, and that
the alleged bad acts occurred at about the time that the wheels of the
apparently previously successful business fell off and Wirth began to scramble
for money from what he perceived as any available sources.  We are likewise mindful of the fact that the
statute states that we may not consider Wirth’s ultimate failure to repay
(standing alone) as evidence.  Indeed,
the State’s argument necessarily focused almost exclusively on the extraneous
bad acts to supply the requisite felonious intent because there is no evidence
associated with the drafts to support the State’s position.  Finally, there is the obvious fact that the
jury apparently could not agree (despite essentially identical evidence
existing for the issuance and dishonor of each draft) that Wirth engaged in
unlawful activities as to all of them. 
After reviewing all of this evidence in detail and studying the trial
record diligently, we find legally insufficient evidence to support the jury’s
conclusion that Wirth intentionally or knowingly issued the drafts without the
intent to honor them. 

            We
reverse the conviction and render a judgment of acquittal.

 

 

 

                                                                        Bailey
C. Moseley

                                                                        Justice

 

Date Submitted:          April 20,
2011

Date Decided:             April 21,
2011

 

Publish











[1]Tex. Const. art. V, § 6.





[2]The
indictment alleged that pursuant to one scheme and continuing course of
conduct, Wirth intentionally and knowingly unlawfully appropriated motor
vehicles of the aggregate value of $200,000.00 or more by bringing about a
transfer of title without the effective consent of Bonham Chrysler Plymouth
Dodge Jeep Eagle, Inc.; Toyota of Lewisville, Inc.; McKinney Dodge, Inc.; Lexus
of Clear Lake, Inc.; and Park Place Motorcars Dallas, the owners of the
property, and with the intent to deprive the owners of the property.  Tex.
Penal Code Ann. § 31.03(a) (Vernon Supp. 2010). 

 





[3]In
our first consideration of this case, Wirth also complained of certain
evidentiary rulings (discussed later) and as to venue in Fannin County (an
argument we previously rejected).





[4]Wirth’s
dealings with Amegy Bank and Rogers are discussed later.





[5]Kiting
is the process of drawing against balances credited to uncollected checks.