

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

## No. 06-08-00220-CR

_____


RAYMOND WAIER WIRTH, Appellant

V.

THE STATE OF TEXAS, Appellee


On Appeal from the 336th Judicial District Court
Fannin County, Texas
Trial Court No. 22758


Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Carter

## OPINION

### I.    Factual Background

#### A.    The Leasing Business

For more than twenty years, Raymond Waier Wirth owned and operated a successful automobile leasing business. The business was operated by two corporations: RW Leasing did the marketing of vehicles and Wirth Leasing, Inc., provided the funding sources and received one-third of the profits. Wirth was the sole owner of Wirth Leasing, Inc., and was a fifty percent owner with James Rogers, sales manager, of RW Leasing. The sales force contacted prospective customers interested in leasing a vehicle; based on the customers' requests, Wirth's company would then contact automobile dealerships and locate the vehicle desired. Wirth Leasing, Inc., had agreements with several major banks wherein Wirth would arrange for transfer of title to the vehicle and assign the lease contract to the bank funding the transaction. After the lease and the customer were approved by the funding bank, a draft drawn on an account of RW Leasing at the Prosper, Texas, bank was sent to the automobile dealership for the purchase price of the vehicle and the vehicle was delivered to the customer. The automobile dealership, on receipt of the draft, would prepare the title documents placing ownership of the vehicle in the funding bank and a draft would be sent to Wirth's bank. When the funding bank received title, it would electronically transfer funds into the RW Leasing bank account in the Prosper Bank. At that time, Wirth would issue a check on the RW Leasing bank account and the draft to the dealership was then honored. The customer made lease

2

payments to the funding bank according to the terms of the contract. Wirth's agreement with the funding banks involved fees or compensation paid to his company on the contracts that had been approved. This process had been in place for several years until the early part of 2005, when some of the drafts sent to automobile dealerships were unpaid and Wirth closed the Prosper bank accounts.

## B. Unpaid Drafts Led to Theft Conviction

Fifteen drafts to automobile dealerships, all signed by Rogers, involving over $500,000.00 were unpaid. Wirth later filed bankruptcy and discharged a great amount of debt.

Wirth was indicted for theft of property over $200,000.00 in connection with the transfer of title of the fifteen vehicles when the drafts for each went unpaid. Allegations of theft involved one Fannin County automobile dealership and other allegations from other dealerships outside the county; they were prosecuted as a continuing conduct or scheme.[1] The jury found Wirth guilty of the lesser offense of theft of $20,000.00 or more but less than $100,000.00 and assessed punishment at ten years' imprisonment and a $10,000.00 fine, and recommended community supervision. The trial court sentenced Wirth accordingly by placing him on community supervision for five years and ordered that he pay restitution of $128,103.27.

---

[1]The indictment alleged that pursuant to one scheme and continuing course of conduct, Wirth intentionally and knowingly unlawfully appropriated motor vehicles of the aggregate value of $200,000.00 or more by bringing about a transfer of title without the effective consent of Bonham Chrysler Plymouth Dodge Jeep Eagle, Inc.; Toyota of Lewisville, Inc.; McKinney Dodge, Inc.; Lexus of Clear Lake, Inc.; and Park Place Motorcars Dallas, the owners of the property, and with the intent to deprive the owners of the property. TEX. PENAL CODE ANN. § 31.03(a) (Vernon Supp. 2008).

Wirth argues there is no evidence to satisfy the intent requirement—effectively arguing that the State has reinstituted the notion of a "debtors prison" by convicting him for failing to repay debts. He further argues that the evidence is insufficient to show that any part of the alleged continuing theft occurred in Fannin County—and thus venue in that county was improper. Finally, he argues that if any criminal wrongdoing occurred, it was not at his hand, but at the hand of James Rogers, an employee of the company. For any of these reasons, he contends, the conviction must be reversed.

## II. Legal and Factual Sufficiency

Wirth argues that the evidence is legally and factually insufficient to support the verdict because of a lack of any evidence that could support a finding of intent to commit theft—at least as to any wrongdoing in Fannin County.

### A. Standard of Review

In reviewing the legal sufficiency of the evidence, we view all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Johnson v. State*, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000).

In a factual sufficiency review, we review all the evidence, but do so in a neutral light and determine whether the evidence supporting the verdict is so weak or is so outweighed by the great weight and preponderance of the evidence that the jury's verdict is clearly wrong or manifestly

4

unjust. *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008); *Roberts v. State*, 220 S.W.3d 521, 524 (Tex. Crim. App. 2007).

In this analysis, we use a hypothetically correct jury charge to evaluate both the legal and factual sufficiency of the evidence. *Grotti v. State*, 273 S.W.3d 273 (Tex. Crim. App. 2008). Such a charge accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Villarreal v. State*, 286 S.W.3d 321(Tex. Crim. App. 2009); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). Wirth does not argue that the charge is incorrect or not one authorized by the indictment, and it tracks the indictment and the statute that criminalizes the conduct involved.

### B. The Statute

The jury was charged to determine whether Wirth, pursuant to one scheme or continuing course of conduct, committed the offense of theft by intentionally or knowingly unlawfully appropriating property by bringing about a transfer of title (of automobiles) without the effective consent of the owners and with intent to deprive the owners of property. The jury was also instructed that consent is not effective if it is induced by deception. Tex. Penal Code Ann. § 31.01(3) (Vernon Supp. 2008).

Deception was defined in the charge as

promising performance that is likely to affect the judgment of another in the transaction and that the actor does not intend to perform or knows will not be

5

performed, except that failure to perform the promise in issue without other evidence of intent or knowledge is not sufficient proof that the actor did not intend to perform or knew the promise would not be performed.

TEX. PENAL CODE ANN. § 31.01(1)(E) (Vernon Supp. 2008).

The evidence was that Wirth was the boss in both businesses; Wirth Leasing had the agreements with the funding banks. Wirth handled bills, signed the paychecks, hired and fired, instituted sales policies, and controlled all financial aspects of the companies. The Prosper Bank account manager, Penny Acker, testified that only Wirth conducted banking on behalf of either company and that she dealt with no other person from either company, that he was the person notified when a draft arrived and that he was the only person to send payment to cover the drafts.

In January and February 2005, some drafts written to the automobile dealerships failed to be honored. Specifically, Toyota of Lewisville received eight drafts which were dishonored; the dates of the drafts were between January 31, 2005 through February 18, 2005. About the same time, Park Place Motors in Dallas received three unpaid drafts within thirty days. McKinney Dodge had two unpaid drafts; Bonham Chrysler received one unpaid draft dated January 19, 2005; Lexus of Clear Lake had an unpaid draft and contacted Wirth, who sent a check on the RW Leasing account, which was also dishonored. All of the witnesses from the automobile dealerships testified that they transferred possession and title to the vehicles, were not paid on the drafts, and were unable to regain possession of the vehicles. (Title had been transferred by the dealers to the respective funding bank.) Likewise, the evidence showed that for each of these transactions, the funding bank approved the

6

lease contracts with the Wirth sales force, and funds to honor the drafts were paid by those banks into the RW Leasing account at the Prosper Bank. The total amount of these fifteen unpaid drafts amounted to over $500,000.00. Bank records were introduced, but none of the withdrawals to the Wirth companies have been shown to be something other than ordinary business transactions. On March 5, 2005, the RW Leasing bank account was closed by Wirth and the balance of $41,813.27 was withdrawn.

### C.    Criminal Intent

In summary, Wirth argues that the evidence is not such as would allow a jury to infer that he had the intent to steal, but rather his argument is that his business failed.

As previously stated, his conviction is pursuant to a Penal Code provision that criminalizes taking funds from another without their effective consent—and consent is not effective if induced by deception—and deception includes promising performance which the promisor does not intend to perform or knows will not be performed. The statute also states that failure to perform, standing alone, is not sufficient proof. TEX. PENAL CODE ANN. § 31.01 (Vernon Supp. 2008).

The statute and hypothetically correct jury charge require the State to prove Wirth did not intend to honor the drafts or knew they would not be honored when issued. Further, failure to honor the drafts, without other evidence of intent or knowledge, is not sufficient proof that Wirth did not intend to perform or knew the drafts would not be honored. The State argues the evidence supporting the finding is:

7

(1)     Wirth owned Wirth Leasing and controlled RW Leasing and was solely in charge of the banking and financial aspects of the business.

(2)     Penny Acker, a banker at the Prosper Bank, told Wirth there were insufficient funds to cover his drafts and he continued business as usual.

(3)     The automobile dealerships took measures to attempt to collect on the drafts, to no avail.

(4)     Wirth blamed others and denied involvement.

(5)     His opulent lifestyle showed he "used other people's money for his own personal benefit without their permission."

(6)     His dishonesty with Amegy Bank on an unrelated matter showed intent to steal from the car dealers.

This Court has previously noted that a claim of theft made in connection with a contract requires proof of more than an intent to deprive and a subsequent appropriation of the property. If only an intent and appropriation are present in a contractual matter, there is no criminal conduct because under the terms of the contract one has the right to "deprive the owner of property" in return for consideration. *Baker v. State*, 986 S.W.2d 271, 274 (Tex. App.—Texarkana 1998, pet. ref'd).

We recognize that criminal intent may be, indeed typically must be, inferred from the nature of the actions taken. Further, mental states are almost always inferred from acts and words. The mental culpability of a defendant is of such a nature that it generally must be inferred from the

8

circumstances in which a prohibited act or omission occurs. A mental state is concealed within the mind of an individual, and can only be determined from his or her words, acts, and conduct. *Moore v. State*, 969 S.W.2d 4, 10 (Tex. Crim. App. 1998). We will examine the State's arguments and the surrounding circumstances for circumstantial evidence that Wirth did not intend to honor the drafts or knew the drafts would not be paid when they were issued.

### 1. Testimony of Penny Acker

Acker testified that in the early days of the account, it was flush with money to cover the drafts, but that began changing about four or five months before Wirth closed the account in 2005. (December 2004 through early March 2005). At that point, there began to be insufficient funds in the account to cover the drafts, and the Prosper Bank began returning some of the drafts. Acker testified she thought Wirth might be kiting checks and thus the bank began holding some deposits until they cleared the bank on which they were drawn.[2] Acker's specific testimony was that in November 2004 the RW Leasing bank account had twelve insufficient charges. She did not speak to Wirth about this, but notified a vice president, who she believed had a meeting with Wirth, at which time Wirth appeared to become agitated, but she did not know if the issues she had been observing were discussed. When asked if Wirth knew drafts were outstanding when he closed the bank account, Acker stated, "As far as I can remember, I think we had a couple." Later, the following exchange occurred:

---

[2]Kiting checks is the process of drawing against balances credited to uncollected checks.

Q.      Just two questions, Ms. Acker.  Going back to the question about the account's [sic] closed and a bank is sending a draft money, and if Mr. Wirth instructed you as you've said -- when the account's closed, to send those back --

A.      He didn't instruct us to send it back.  I mean --

Q.      I'm sorry.  I misunderstood your testimony . . . .

This testimony does not specifically show that Wirth was made aware drafts were still outstanding when he closed the bank account.  Further, these events occurred some time after the drafts were issued and the vehicles were delivered and could not directly show Wirth's  intent to deceive at the time the drafts were issued and the property was appropriated.  Relevant intent to deprive the owner of property is the accused's intent at the time of the taking.  *Peterson v. State*, 645 S.W.2d 807, 811 (Tex. Crim. App. 1983) (citing *Griffin v. State*, 614 S.W.2d 155 (Tex. Crim. App. 1981)).  "In sum, the State must show a rational factfinder could have found appellant had no intention of fulfilling his obligation under the agreement, and his promise to perform was 'merely a ruse to accomplish theft by deception.'"  *Jacobs v. State*, 230 S.W.3d 225 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (quoting *King v. State*, 17 S.W.3d 7, 15 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd)).

### 2.      Personal Gain

Another consideration in determining whether Wirth had criminal intent is whether he experienced personal gain from the property obtained. *Christensen v. State*, 240 S.W.3d 25, 33 (Tex. App.—Houston [1st Dist.] 2007, no pet.).  In this case, the State introduced Wirth's bank records, but has not directed this Court to any instances of Wirth withdrawing funds for his personal gain.

10

No attempt was made to show that any Wirth Leasing, Inc., withdrawal was not a proper business item. Instead, the State's argument proceeds from the premise that the funding banks placed money in the RW Leasing account for each draft representing a vehicle transaction and Wirth expended large sums of money for housing, vehicles, and recreational property and lived an "opulent" lifestyle. Based on those two facts, the State argues the jury could reasonably infer that Wirth intended to deceive various automobile dealerships when he had no intent to pay or knew the drafts would not be paid, all to support his luxurious lifestyle. But the evidence also shows that Wirth's business had produced substantial revenue for many years sufficient to support an abundant life (according to Wirth's proposal, the business had gross profits of $651,179.02 for the first nine months of 2004). Further, such a conclusion requires a stretch of logic. The fact that Wirth lives in a high style could reasonably lead to an inference that he has access to sufficient funds to support it, not that he intentionally issued drafts knowing they would not be paid.

Both Wirth and James Rogers were authorized to write checks or make withdrawals from the RW Leasing bank account. Ultimately, Wirth lost his business of many years and declared personal bankruptcy.

### D.     Extraneous Bad Acts

#### 1.     Bloodgood Transaction

The State argues that evidence of Wirth's intent to deceive is shown by the testimony of James Bloodgood concerning the unrelated business transaction with Ray Wirth. Wirth complains

11

this evidence was inadmissible, citing Rule 404 of the Texas Rules of Evidence. *See* Tex. R. Evid. 404.

Jim Bloodgood, a vice president at Amegy Bank, testified to a sequence of overdrafts in two of Wirth's accounts, and likewise suspected Wirth of kiting. He testified that he ultimately asked Wirth to liquidate securities that were partially used as collateral on a $50,000.00 line of credit, and to use the overage (about $36,000.00) toward the uncollected portion of Wirth's accounts, and Bloodgood released the securities for that purpose. (Wirth had several accounts there, one for another of his companies, Certified Vehicle Leasing, and another for Wirth Leasing, as well as personal accounts.) There is evidence that a form used by Bloodgood, signed by him February 10, 2005, was altered after it was in Wirth's possession and after the securities were sold, the funds were instead transmitted to Wirth's personal account—whereupon he withdrew them in a series of cashier's checks from a different branch.

Bloodgood testified that his bank was ultimately unable to collect on the line of credit and lost an additional $41,000.00 as a result of the uncollected fund transfers. So the question becomes whether the fact that evidence showed Wirth misled Bloodgood into thinking he would liquidate his securities to pay the loan to Amegy Bank, when, according to Bloodgood, he managed to sell the stocks, which were security for the loan, and have the money transferred to his own account without paying the bank loan is evidence of an intent in this case to deceive the automobile dealerships and steal their money by having his sales manager issue drafts to the dealerships?

Texas law does not allow the presentation of evidence of other crimes, wrongs, or acts to prove the character of a person in order to show action in conformity therewith. TEX. R. EVID. 404(b). "An accused person is entitled to be tried on the accusation made in the State's pleading and not on some collateral crime, or for being a criminal generally." *Sims v. State*, 273 S.W.3d 291, 295 (Tex. Crim. App. 2008) (citing *Young v. State*, 159 Tex. Crim. 164, 165, 261 S.W.2d 836, 837 (1953)). But extraneous offense evidence may be used to prove intent when that is an issue. TEX. R. EVID. 404(b). In a case involving allegations of theft by deception for failing to pay for goods as agreed, the Texas Court of Criminal Appeals has approved evidence of other business transactions in which the defendant failed to pay for the products. *Plante v. State*, 692 S.W.2d 487 (Tex. Crim. App. 1985). Additionally, the theft statute declares that other recent and similar transactions are admissible to show knowledge or intent. TEX. PENAL CODE ANN. § 31.03(c)(1) (Vernon Supp. 2008). The difficulty is this specific extraneous act may also involve the prohibited use of character evidence: to prove the character of a person in order to show action in conformity therewith. *See* 1 Goode, Wellborn & Sharlot, *Texas Practice: Guide to the Texas Rules of Evidence* § 404.6.3 (3d ed. 2002 & Supp. 2009). But if the testimony of Bloodgood regarding the other bank transaction is admissible on the issue of intent, it does constitute some evidence on that material issue. Logically, if this evidence is relevant on the issue of intent, it is some evidence from which a jury could infer that Wirth did not intend to honor the drafts or knew they would not be honored, and

13

therefore meets the minimum required for the legal sufficiency test. Relying on *Plante*, we find the evidence was admissible under Rule 404(b).

Reviewing the evidence for factual sufficiency, we do so in a neutral light to determine if the evidence is so weak or so against the great weight and preponderance of the evidence that the jury's verdict is clearly wrong and unjust. This review requires us to attach some degree of probative value to the evidence and determine the strength or weakness of the supporting evidence. As we have previously outlined, the evidence that we found that constituted "some evidence" to allow the jury to infer the issue of intent was the testimony concerning the other bank transaction. When we look at that transaction, we find that it is substantially dissimilar to the allegations of deception lodged against Wirth by this indictment. In the Bloodgood testimony, it is suggested that Wirth manipulated Bloodgood and his bank into signing a form that later was altered. Since the document was in Wirth's possession, and since the document's alteration allowed him to receive the funds without paying the bank loan, it is inferred that he altered it or had it altered. If this allegation is true, Wirth deliberately took affirmative actions which resulted in his improperly receiving the funds.

By contrast, the drafts issued to the automobile dealerships were done in the regular course of Wirth's business that he had successfully conducted for many years. No irregularity (such as altering instruments) was shown. The drafts were signed by Rogers, who had handled these transactions for years; the lease contracts were approved by the funding banks; the money was sent to the leasing bank account and, except for the fifteen drafts executed just before the business

14

collapsed, drafts issued in the same manner had been honored by Wirth's business for a period of years. For 2004, the company was issuing and honoring at least thirty to forty such drafts every month. While there is no explanation as to why the funds to pay for the drafts dissipated over a period of time, neither have we been directed to any evidence of Wirth personally raiding the bank account. Considering the broad discretion vested in the trial court, while the evidence of the Bloodgood incident was not inadmissible, we find its probative value on the issue of Wirth's intent not to honor the drafts to be weak and insubstantial.

Wirth also argues this evidence should have been excluded under Rule 403 of the Texas Rules of Evidence. *See* TEX. R. EVID. 403. We recognize the broad discretion of the trial court to consider the factors reiterated in *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006). Based on that discretion, we cannot say the trial court erred in admitting this evidence.

### 2.     The Rogers Insurance Policy

Wirth also complains about the admission of testimony from Rogers about Wirth's liquidation of what Rogers testified was an insurance policy that represented his retirement account. The testimony was that Wirth had purchased a life insurance policy designed to compensate Wirth if Rogers died while employed, with half the benefits to Wirth and half to Rogers' wife. However, if Rogers retired, he was then to receive the cash value of the policy as his retirement benefit. The evidence was that Wirth cashed out the policy—at about the same time of the Bloodgood

15

transaction.  The State argues this evidence showed Wirth's intent to deprive another of property which he formed or possessed at or about the same time the fraudulent drafts were issued.

Once again, the general rule is that evidence of specific instances of conduct may not be introduced to prove the character of a person in order to show action in conformity to that character. It may be admissible for other issues, such as intent.  But the proposed evidence should have some relevance to prove the intentional conduct in the trial before the court, not just the intentional conduct of the extraneous act.  Here, it is not entirely evident that Wirth's actions showed an intention to deprive Rogers—there is no written documentation of this agreement; the Wirth business purchased the insurance policy and Rogers contributed nothing; Rogers did not retire from the business, but resigned and left his employment and became employed elsewhere in the automobile sales business.  The fact that Wirth cashed in an insurance policy, some proceeds of which Rogers claimed, is an entirely different matter than the charge that he appropriated property from car dealerships by causing Rogers to issue them a draft.  The theft statute allows the admission of evidence that the defendant participated in previous similar transactions to show knowledge or intent.  TEX. PENAL CODE ANN. § 31.03(c)(1).  At most, the State's argument is that the liquidation of the insurance policy shows Wirth deprived Rogers of property.  The logical extension of this argument is that Wirth, being unprincipled, would also cheat the car dealers.  This is nothing more than offering character evidence by the use of bad acts to suggest the defendant acted in conformity

16

with that character; such evidence is inadmissible. But, in view of the entire evidence in this case, this is but a blip on the screen and did not affect Wirth's substantial rights and is therefore harmless.

### E.     Closing the Account

Finally, the State argues that Wirth's closing of the account and withdrawing $41,000.00 also proves his intent to deceive. But the intent to deceive must have occurred when the drafts were written. Does the fact that Wirth withdrew $41,000.00 evidence his intent that when Rogers issued drafts on approved contracts, Wirth intended that these eight drafts would not be honored? Failing to pay those drafts was a violation of his contract and perhaps shows a character flaw, but it does not evidence Wirth's intentions to select drafts that he would refuse to pay. There simply is no evidence that when these drafts were issued by Rogers on approved contracts, Wirth had an intention or knew they would not be honored.

### F.     Jury Verdict

We recognize that our review of factual sufficiency must be deferential to the jury verdict with a high level of skepticism about the jury verdict required before a reversal can occur. *Roberts*, 220 S.W.3d at 524. But here, the jury verdict itself is abstruse. The jury was instructed that it could convict Wirth under the indictment for theft over $200,000.00 or for lesser offenses. Since the jury convicted him of the lesser offense of theft over $20,000.00 but less than $100,000.00, and since the total amount of the fifteen drafts was more than $500,000.00, the jury could not agree that he was guilty of theft as to some of the eleven to twelve drafts in question. Based on the draft amounts, at

17

most the jury could have found that he was guilty as to four of the drafts. The evidence of the alleged theft was almost identical in each case; a draft was issued but dishonored and the automobile dealerships were unable to recover either the money or the automobile. These facts were not disputed. The extraneous bad acts introduced applied to the entire case. In eleven or twelve of the draft transactions apparently the jury found this evidence was insufficient—but the same evidence convinced the jury he was guilty on three or four of the drafts. This provides some additional skepticism about the verdict.

## III.    Venue

Wirth argues that venue was not proper in Fannin County because the State did not produce legally or factually sufficient evidence that an offense occurred within Fannin County. This argument was not presented to the trial court. Unless venue is disputed in the trial court, or unless the record affirmatively shows the contrary, we must presume that venue was proved in the trial court. TEX. R. APP. P. 44.2(c)(1). In a case in which thefts are aggregated under Section 31.09 of the Texas Penal Code, they become elements of a single crime and venue is proper in any county in which the individual thefts or any element thereof occurred. *State v. Weaver*, 982 S.W.2d 892, 893 (Tex. Crim. App. 1998); *see* TEX. PENAL CODE ANN. § 31.09 (Vernon 2003). The State properly alleged aggregated offenses and further that one offense occurred in Fannin County, Texas. Evidence was produced that a draft from Wirth Leasing was presented to a Fannin County automobile dealer. Since the venue issue was not raised at trial and the record does not show

18

improper venue, we must presume the venue issue was properly proved. Wirth's point of error on venue is overruled.

## IV.    Conclusion

We have discussed each of the items of evidence that the State proposes indicates that Wirth deceived the automobile dealers by promising a performance that he did not intend to keep or that he knew would not be performed. After reviewing all of this evidence in detail and studying the trial record diligently, we conclude the evidence is factually insufficient to support the jury verdict. It is so weak that the jury's verdict is clearly wrong and unjust. We remand the case for a new trial.

Jack Carter
Justice

Date Submitted:    July 2, 2009
Date Decided:     September 28, 2009

Publish