

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

## No. 06-08-00220-CR

_____


RAYMOND WAIER WIRTH, Appellant

V.

THE STATE OF TEXAS, Appellee


On Appeal from the 336th Judicial District Court
Fannin County, Texas
Trial Court No. 22758


Before Morriss, C.J., Carter and Moseley, JJ.
Opinion on Remand by Justice Moseley

OPINION ON REMAND

On January 31, 1996, the Texas Court of Criminal Appeals issued its ruling in *Clewis v. State*, 922 S.W.2d 126 (Tex. Crim. App. 1996), wherein it acknowledged that the Texas Constitution conferred upon the courts of appeals "appellate jurisdiction, *under such regulations as may be prescribed by law. Provided, that the decision of said courts [of appeals] shall be conclusive on all questions of fact brought before them on appeal or error*"[1] and ruled that the authority to rule on the factual sufficiency of evidence extended to reviews in criminal cases. In the *Clewis* case, it was announced that the proper standard of review for factual sufficiency of the elements of the offense to be employed by the courts of appeals, "views all the evidence without the prism of 'in the light most favorable to the prosecution.'. . . [and] sets aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Id.* at 129. This factual sufficiency review standard announced at that time was contrasted with that of the legal sufficiency review standard set out by the United States Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979): "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Clewis*, 922 S.W.2d at 128–29.

Based on that distinction and employing the differing standards announced in *Clewis*, this Court found that although there was legally sufficient evidence to warrant the conviction of Raymond Waier Wirth by a jury for the charged crime of theft of $20,000.00 or more but less than

[1]TEX. CONST. art. V, § 6.

$100,000.00, the evidence was factually insufficient to support the conviction. *Wirth v. State*, 296 S.W.3d 895 (Tex. App.—Texarkana 2009), *vacated & remanded*, 327 S.W.3d 164 (Tex. Crim. App. 2010). Although our ruling in that case also dealt with the admissibility of certain evidence and with complaints regarding venue, the sole issue raised by the State in its petition for discretionary review dealt with the determination that there was factually insufficient evidence to support the conviction.

Subsequent to the issuance of that opinion by this Court, but before the *Wirth* case was disposed of by it on appeal, the Texas Court of Criminal Appeals issued its opinion in *Brooks v. State*, 323 S.W.3d 893, 894 (Tex. Crim. App. 2010). In *Brooks*, the Texas Court of Criminal Appeals took its "next small step," whereby it ended its almost fifteen-year flirtation with the Texas Constitution's grant to the courts of appeals of the exclusive and conclusive duty of factual sufficiency review, determining that there had become no meaningful distinction between the *Jackson* legal sufficiency standard and the *Clewis* factual sufficiency standard of review, specifically overruling *Clewis*. *Id.* at 912. It then vacated this Court's judgment in the *Wirth* case and remanded it to us for reconsideration, this time to take into account the disintegration of the *Clewis* factual sufficiency review as announced in *Brooks*. *Wirth*, 327 S.W.3d at 165.

I. **Factual Background**

    A. **The Leasing Business**

The charges against Wirth arose from his operation of an automobile leasing business, a trade that had been operated by him for more than twenty years. The business was operated under the umbrella of two corporations with different functions: RW Leasing did the marketing of vehicles and Wirth Leasing, Inc., provided the funding sources and received one-third of the profits. Whereas Wirth was the sole owner of Wirth Leasing, Inc., he owned only half of RW Leasing, the other half being owned by its sales manager, James Rogers. Under the business plan, the sales force made contact with persons interested in leasing automobiles and would solicit information from those prospective customers regarding the type of automobile they wanted to lease and the prices they were willing to pay. Armed with this information, the company would locate automobiles through dealerships to fill the customers' needs and wants and negotiate for the purchase of the automobiles. Wirth Leasing, Inc., through its contacts with several major banking institutions, would seek approval by the bank of the customer as lessee, arrange for the purchase of the automobiles, arrange for the transfer of the title to the vehicle, sign the lease agreement with the customer, and then assign the lease agreement to the financing bank. A draft (in this circumstance, each of which was signed by Rogers in his capacity as the agent for RW Leasing) would be drawn on the account of RW Leasing at the First State Bank of Prosper, Texas, and sent to the automobile dealership for the purchase price of the vehicle, and the vehicle was delivered to the customer. When the funding bank received the car title, it would electronically transfer funds into the RW Leasing bank account at the Prosper bank; upon receipt of the funds, a check drawn on

4

the RW Leasing bank account was used to honor the draft presented by the dealership. The customer made lease payments directly to the funding bank as the assignee of the lease contract according to the terms of the contract. Wirth's agreement with the funding banks involved fees or compensation paid to his company on the contracts that had been approved. This process had been in place for several years until the early part of 2005, at which time the carefully-orchestrated scheme fell apart when at least fifteen of the drafts (totaling over half a million dollars, each signed by Rogers in his representative capacity) sent to automobile dealerships were dishonored and Wirth closed the Prosper bank accounts. A large part of this debt was discharged by Wirth through a bankruptcy proceeding.

Wirth was indicted for theft of property over $200,000.00 in connection with the transfer of title of the fifteen vehicles when the drafts for each remained unsatisfied. Allegations of theft involved one Fannin County automobile dealership and other allegations from other dealerships outside Fannin County, all of which were prosecuted together as a continuing conduct or scheme.[2] The jury found Wirth guilty of the lesser offense of theft of $20,000.00 or more but less than $100,000.00 and assessed punishment at ten years' imprisonment and a $10,000.00 fine, and

---

[2]The indictment alleged that pursuant to one scheme and continuing course of conduct, Wirth intentionally and knowingly unlawfully appropriated motor vehicles of the aggregate value of $200,000.00 or more by bringing about a transfer of title without the effective consent of Bonham Chrysler Plymouth Dodge Jeep Eagle, Inc.; Toyota of Lewisville, Inc.; McKinney Dodge, Inc.; Lexus of Clear Lake, Inc.; and Park Place Motorcars Dallas, the owners of the property, and with the intent to deprive the owners of the property. TEX. PENAL CODE ANN. § 31.03(a) (Vernon Supp. 2010).

recommended community supervision. The trial court sentenced Wirth accordingly by placing him on community supervision for five years and ordered that he pay restitution of $128,103.27.

### B. Argument of Wirth

Wirth argues there is no evidence to satisfy the mandatory criminal intent requirement of the charged offense, maintaining that by this prosecution, the State is attempting to reinstitute the notion of a "debtors prison" by convicting him for failing to repay debts. He further argues that if any criminal wrongdoing occurred, it was not at his hand, but at the hand of Rogers, an employee of the company.[3]

## II. Sufficiency of the Evidence

Under the redesign of *Brooks*, Wirth argues that the evidence is insufficient to support the verdict because of a lack of evidence that could support a finding of Wirth's intention to commit theft, a necessary element of the charged offense.

### A. Standard of Review

Under the present state of the law, in evaluating legal sufficiency, we review all the evidence in the light most favorable to the jury's verdict to determine whether any rational jury could have found the essential elements of the charged offense beyond a reasonable doubt. *Brooks*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (citing *Jackson*, 443 U.S. at 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd). Our rigorous

---

[3]In our first consideration of this case, Wirth also complained of certain evidentiary rulings (discussed later) and as to venue in Fannin County (an argument we previously rejected).

legal sufficiency review focuses on the quality of the evidence presented. *Brooks*, 323 S.W.3d at 917 (Cochran, J., concurring). We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

In this analysis, we continue to use a hypothetically-correct jury charge to evaluate the sufficiency of the evidence. *Grotti v. State*, 273 S.W.3d 273 (Tex. Crim. App. 2008). Such a charge accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Villarreal v. State*, 286 S.W.3d 321 (Tex. Crim. App. 2009); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). Wirth does not argue that the charge is incorrect or not one authorized by the indictment, and it tracks the indictment and the statute that criminalizes the conduct involved.

### B. The Statute

The jury was charged to determine whether Wirth, pursuant to one scheme or continuing course of conduct, committed the offense of theft by intentionally or knowingly unlawfully appropriating property by bringing about a transfer of title (of automobiles) without the effective consent of the owners and with intent to deprive the owners of property. The jury was also

7

instructed that consent is not effective if it is induced by deception. TEX. PENAL CODE ANN. § 31.01(3) (Vernon Supp. 2010).

"Deception" was defined in the charge as

promising performance that is likely to affect the judgment of another in the transaction and that the actor does not intend to perform or knows will not be performed, except that failure to perform the promise in issue without other evidence of intent or knowledge is not sufficient proof that the actor did not intend to perform or knew the promise would not be performed.

TEX. PENAL CODE ANN. § 31.01(1)(E) (Vernon Supp. 2010).

### C. Underlying Events

The evidence was that Wirth was in charge of both businesses; Wirth Leasing had the agreements with the funding banks. Wirth handled bills, signed the paychecks, hired and fired, instituted sales policies, and controlled all financial aspects of the companies. The Prosper bank account manager, Penny Acker, testified that only Wirth conducted banking on behalf of both companies and that she dealt with no other person from either company, that he was the person notified when a draft arrived, and that he was the only person to send payment to cover the drafts. In January and February 2005, some drafts written to the automobile dealerships failed to be honored. Specifically, Toyota of Lewisville received eight drafts which were dishonored; the dates of the drafts were between January 31, 2005 through February 18, 2005. At about the same time, Park Place Motorcars in Dallas presented three drafts within thirty days, none of which were honored. McKinney Dodge had two unpaid drafts; Bonham Chrysler received one unpaid draft

8

dated January 19, 2005; Lexus of Clear Lake had an unpaid draft and contacted Wirth, who sent a check (also returned unpaid) on the RW Leasing account. All of the witnesses from the automobile dealerships testified that they transferred possession and title to the vehicles, were not paid on the drafts, and were unable to regain possession of the vehicles. (Title had been transferred by the dealers to the respective funding banks.) Likewise, the evidence showed that for each of these transactions, the funding bank approved the lease contracts with the Wirth sales force, and funds to honor the drafts were paid by those banks into the RW Leasing account at the Prosper bank. The total amount of these fifteen unpaid drafts amounted to over $500,000.00. Bank records were introduced, but none of the withdrawals to the Wirth companies have been shown to be something other than ordinary business transactions. On March 5, 2005, the RW Leasing bank account was closed by Wirth and the balance of $41,813.27 was withdrawn.

### D. Criminal Intent

In summary, Wirth argues that the evidence is not such as would allow a jury to infer that he had the intent to steal, but rather his argument is that his business simply failed. There is evidence that Wirth was a profligate spender and that when the business began its precipitous death spiral, he first juggled funds and then ran far short of the necessary monies to satisfy the drafts. However, although the denouement of the business was rather spectacularly unsuccessful, it had earned a considerable amount of money over an extended multi-year period of time. There is no doubt that the "money well" ultimately ran dry and that Wirth filed for bankruptcy. There is

9

no doubt that Wirth behaved poorly and, perhaps, illegally in his relationship with Amegy Bank and that his conduct toward a longtime employee may have been (at best) self-serving and dishonorable.[4] However, the prosecution before this Court concerns neither of those actions, but whether there is sufficient evidence to allow a jury to determine that he had the intent to steal at the time that he obtained the moneys which were intended to be used to satisfy the drafts.

As previously stated, Wirth's conviction is pursuant to a Texas Penal Code provision that criminalizes taking funds from another without their effective consent. (Consent is not effective if induced by deception. Deception includes promising performance which the promisor does not intend to perform or knows will not be performed.) The statute also states that failure to perform, standing alone, is not sufficient proof. TEX. PENAL CODE ANN. § 31.01 (Vernon Supp. 2010).

The statute and the hypothetically-correct jury charge analysis require the State to prove that Wirth did not intend to honor the drafts or knew they would not be honored when the drafts were issued. Further, failure to honor the drafts, without other evidence of intent or knowledge, is not sufficient proof that Wirth did not intend to perform or knew the drafts would not be honored. The State argues that the evidence supporting the finding is:

(1) Wirth owned Wirth Leasing and controlled RW Leasing and was solely in charge of the banking and financial aspects of the business.

(2) Acker, a banker at the Prosper bank, told Wirth there were insufficient funds to cover his drafts and, yet, he continued business as usual.

[4]Wirth's dealings with Amegy Bank and Rogers are discussed later.

10

(3)     The automobile dealerships took measures to attempt to collect on the drafts, to no avail.

(4)     Wirth blamed others and denied involvement.

(5)     His opulent lifestyle showed he "used other people's money for his own personal benefit without their permission."

(6)     His dishonesty with Amegy Bank on an unrelated matter showed intent to steal from the car dealers.

This Court has previously noted that a claim of theft made in connection with a contract requires proof of more than an intent to deprive and a subsequent appropriation of the property. If only an intent and appropriation are present in a contractual matter, there is no criminal conduct because under the terms of the contract, one has the right to "deprive the owner of property" in return for consideration. *Baker v. State*, 986 S.W.2d 271, 274 (Tex. App.—Texarkana 1998, pet. ref'd).

We recognize that criminal intent may be (indeed, typically must be) inferred from the nature of the actions taken. Further, mental states are almost always inferred from acts and words. The mental culpability of a defendant is of such a nature that it generally must be inferred from the circumstances in which a prohibited act or omission occurs. A mental state is concealed within the mind of an individual, and can only be determined from his words, acts, and conduct. *Moore v. State*, 969 S.W.2d 4, 10 (Tex. Crim. App. 1998). We, therefore, examine the State's arguments and the surrounding circumstances for evidence from which a jury could draw the

11

conclusion that Wirth did not intend to honor the drafts or knew the drafts would not be paid when they were issued.

### 1. Testimony of Penny Acker

Acker, an employee of the bank in Prosper where the company's checking accounts were maintained, testified that in the early days of the account, it was flush with money to cover the drafts, but that began changing about four or five months before Wirth closed the account in 2005. (i.e., December 2004 through early March 2005). At that point, there began to be insufficient funds in the account to cover the drafts, and the Prosper bank began returning some of the drafts unpaid. Acker testified that she thought Wirth might be kiting[5] funds and, based on that suspicion, the bank began holding some deposits until they cleared the bank on which they were drawn. Acker's specific testimony was that in November 2004, the RW Leasing bank account had twelve insufficient fund check charges. She did not speak to Wirth about this, but notified a vice president, who she believed had a meeting with Wirth, at which time Wirth appeared to become agitated, but she did not know if the issues she had been observing were discussed. When asked if Wirth was aware that drafts were outstanding at the time he closed the bank account, Acker stated, "As far as I can remember, I think we had a couple." Later, the following exchange occurred:

> Q. Just two questions, Ms. Acker. Going back to the question about the account's [sic] closed and a bank is sending a draft money, and if Mr. Wirth instructed you as you've said -- when the account's closed, to send those back --

---

[5]Kiting is the process of drawing against balances credited to uncollected checks.

12

A.    He didn't instruct us to send it back.   I mean --

Q.    I'm sorry.   I misunderstood your testimony . . . .

There is no showing by this testimony that Wirth was made aware that the drafts were still outstanding when he closed the bank account.   The testimony showed that these events occurred some time after the drafts had already been issued and the vehicles had been delivered; therefore, it did not serve to prove up Wirth's intent to deceive at the time the drafts were issued and the property was appropriated.   We must reiterate that the relevant intent to deprive the owner of property is the accused's intent at the time of the taking.   *Peterson v. State*, 645 S.W.2d 807, 811 (Tex. Crim. App. 1983) (citing *Griffin v. State*, 614 S.W.2d 155 (Tex. Crim. App. 1981)).   "In sum, the State must show a rational fact[-]finder could have found appellant had no intention of fulfilling his obligation under the agreement, and his promise to perform was 'merely a ruse to accomplish theft by deception.'"   *Jacobs v. State*, 230 S.W.3d 225, 230 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (quoting *King v. State*, 17 S.W.3d 7, 15 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd)).

### 2.    Personal Gain

Another consideration in determining whether Wirth had criminal intent is whether he experienced personal gain from the property obtained.   *Christensen v. State*, 240 S.W.3d 25, 33 (Tex. App.—Houston [1st Dist.] 2007, no pet.).   In this case, the State introduced Wirth's bank records, but has not directed this Court to any instances in them of Wirth withdrawing funds for his

13

personal gain.   No attempt was made to show that any Wirth Leasing, Inc., withdrawal was not a proper business item.   Instead, the State's argument proceeds from the premise that the funding banks placed money in the RW Leasing account for each draft representing a vehicle transaction and Wirth expended large sums of money for housing, vehicles, and recreational property and lived an "opulent" lifestyle.   Based on those two facts, the State argues that the jury could reasonably infer that Wirth intended to deceive various automobile dealerships when he had no intent to pay or knew the drafts would not be paid, all to support his luxurious lifestyle.

However, the evidence also shows that Wirth's business had produced substantial revenue for many years, which had apparently been sufficient to support an abundant lifestyle (according to Wirth's proposal, the business had gross profits of $651,179.02 for the first nine months of 2004). Further, such a conclusion requires a considerable stretch of logic.   The fact that Wirth lived in high style could reasonably lead to an inference that he had access to sufficient funds to support it, not that he intentionally issued drafts with the simultaneous awareness that they would not be paid. We must remember that Wirth was not charged with living beyond his means; if that were a crime, a substantial part of the American populace would be subject to being firmly ensconced behind bars.

Both Wirth and Rogers were authorized to write checks or make withdrawals from the RW Leasing bank account.   Ultimately, Wirth lost his business of many years and declared personal bankruptcy.

14

### E. Extraneous Bad Acts

#### 1. Amegy Bank Transaction (Testimony of James Bloodgood)

The State also argues that evidence of Wirth's intent to deceive is shown by the testimony of James Bloodgood, a vice-president of Amegy Bank, regarding a business transaction with Wirth that is unrelated to this prosecution. Wirth complained this evidence was inadmissible, citing Rule 404 of the Texas Rules of Evidence. *See* TEX. R. EVID. 404. In our previous opinion, we ruled this evidence to have been admissible; since no appeal was taken regarding that issue, it is a final ruling.

Reiterating that evidence, the record shows that Bloodgood testified to a sequence of overdrafts in two of Wirth's accounts with that bank and opined that he, likewise, suspected Wirth of kiting. Bloodgood testified that he ultimately asked Wirth to liquidate securities that were partially used as collateral on a $50,000.00 line of credit toward the end that the overage (about $36,000.00) could be applied toward the uncollected portion of Wirth's accounts. Bloodgood stated that he had released the securities for that purpose. (Wirth maintained several accounts there: one for another of his companies, Certified Vehicle Leasing, and another for Wirth Leasing, as well as personal accounts.) There is evidence that a form used by Bloodgood for the release of the security interest which was signed by him February 10, 2005, was altered after it was in Wirth's possession. After the securities were sold, the funds thus realized were not applied to the debt at Amegy Bank, but were, instead, transmitted to Wirth's personal account and then

15

deducted by him from that account via a series of cashier's checks from a different branch.  This occurred during the three-month time frame during which the drafts involved with this prosecution were issued.  Bloodgood testified that his bank was ultimately unable to collect on the line of credit and lost an additional $41,000.00 as a result of the uncollected fund transfers.  Evidence showed that Wirth misled Bloodgood into thinking he would liquidate his securities to pay the loan to Amegy Bank.  Then, according to Bloodgood, Wirth managed to sell the previously secured stocks and have the proceeds from their sale transferred to his own account without satisfying the bank loan which had been secured by them.  Logically, if this evidence is relevant on the issue of intent, it is some evidence from which a jury could infer that Wirth did not intend to honor the drafts at the time they were issued or that he knew they would not be honored.

Reviewing the evidence for legal sufficiency pursuant to the plurality opinion in *Brooks*, we defer to the responsibility of the jury to resolve conflicts, weigh evidence, and draw reasonable inferences, but we are also aware that we must review the evidence rigorously in order to fulfill our duty as a reviewing court, which (by necessity) includes a focus on the quality of the evidence presented.  *Brooks*, 323 S.W.3d at 917.

As we have previously outlined, the evidence that we found that constituted "some evidence" sufficient under *Clewis* to allow the jury to infer the issue of intent was the testimony concerning the other bank transaction.  However, under the rigorous review now required under the proper sufficiency analysis, the existence of any evidence is not determinative of whether the

16

evidence is sufficient to allow a rational jury to find Wirth guilty beyond a reasonable doubt. When we look at that transaction, we find that it is substantially dissimilar to the allegations of deception lodged against Wirth by this indictment. In the Bloodgood testimony, it is suggested that Wirth manipulated Bloodgood and his bank into signing a form that later was altered. Since the document was in Wirth's possession, and since the document's alteration allowed him to receive the funds without paying the bank loan, the implication is that he either altered it himself or caused it to be altered. If this allegation is true, Wirth deliberately took affirmative actions which resulted in his improperly receiving the funds. That misconduct, however, is no part of the charges for which Wirth was on trial.

Wirth's dealings with the banks and automobile dealerships in connection with the drafts are not analogous to his dealings with Amegy Bank. As previously noted, drafts issued to the automobile dealerships were integral to the same procedures previously followed many times in the regular course of a business that Wirth had successfully conducted for many years. No irregularity (such as the alteration of commercial instruments) was shown in any of the transactions which are the heart of the State's case against Wirth. The drafts were signed by Rogers, who had handled these transactions for years; the lease contracts were approved by the funding banks; the money was sent to the leasing bank account; and, except for the fifteen drafts executed just before the business collapsed in a heap, drafts issued in the same manner had been honored by Wirth's business for a period of years. For 2004, the company was issuing and

17

honoring at least thirty to forty such drafts every month. While there is no explanation as to why the funds to pay for the drafts dissipated over a period of time, we have not been directed to any evidence of Wirth personally raiding the bank account to any greater extent than he had done before, when the business was successful. We have previously concluded that the evidence of the Bloodgood incident was admissible, albeit with some misgivings. However, there is a complete absence of any evidence from which an inference could be drawn that might show that the Amegy Bank incident involving Bloodgood had a place in some grand plan or scheme to steal or defraud. In the absence of some perceptible and reasonable linkage with such, we find its probative value to support a reasonable inference that Wirth had the necessary intent not to honor the drafts to be weak and insubstantial.

### 2. The Rogers Insurance Policy

Wirth also complained of the admission of testimony from Rogers about Wirth's liquidation of what Rogers testified was an insurance policy that represented his retirement account. We recount that testimony (much in the same form as our original opinion issued in this case) to aid in understanding the issue of sufficiency. Rogers testified that Wirth had purchased a life insurance policy designed to compensate Wirth if Rogers died while employed, with half the benefits to Wirth and half to Rogers' wife. However, if Rogers retired, he was then to receive the cash value of the policy as his retirement benefit. Rogers went on to state that Wirth cashed in the life insurance policy and gave none of the proceeds to Rogers, this occurring at about the same

18

time of the Amegy Bank transaction. As with the Bloodgood evidence about the Amegy Bank transaction, the State also argued that this evidence showed Wirth's intent to deprive another of property which he formed or possessed at or about the same time the fraudulent drafts were issued.

In our previous opinion in this case, we ruled that Wirth's actions concerning the Rogers insurance policy was not sufficiently similar to the offense with which Wirth was charged to have been relevant to the issue of Wirth's *mens rea* with regard to the crime with which he had been charged. Therefore, it did not meet the measure of being a similar transaction as contemplated pursuant to Section 31.03(c)(1) of the Texas Penal Code and was, therefore, inadmissible as evidence. TEX. PENAL CODE ANN. § 31.03(c)(1) (Vernon Supp. 2010). However, although we determined this evidence to have been inadmissible, we also deemed it to have been harmless error.

### F.      Closing the Account

Finally, the State argues that Wirth's closing of the account and withdrawing $41,000.00 also proves his intent to deceive. But the intent to deceive must have occurred at the time the drafts were written. Does the fact that Wirth withdrew $41,000.00 evidence his intent that when Rogers issued drafts on approved contracts, Wirth intended that these drafts would not be honored? Although failing to pay those drafts was a violation of his contract, it was also a diversion from his prior business practices, which is perhaps revelatory of a character flaw and certainly demonstrative of bad business practices; however, it does not evidence Wirth's intention

19

to create and deliver drafts that he would then refuse to pay. There simply is no evidence when these drafts were issued by Rogers on approved contracts, that Wirth possessed the intention at that time to dishonor them or that he knew they would not be honored when they were issued.

## III.   Conclusion

We have discussed each of the items of evidence that the State put forward to support its position that Wirth deceived the automobile dealers by promising a performance that he did not then intend to keep or that he then knew would not be performed. The only connection between the extraneous alleged bad acts and the charged offenses is that Wirth was involved in those acts, that appropriation of money was involved, and that the alleged bad acts occurred at about the time that the wheels of the apparently previously successful business fell off and Wirth began to scramble for money from what he perceived as any available sources. We are likewise mindful of the fact that the statute states that we may not consider Wirth's ultimate failure to repay (standing alone) as evidence. Indeed, the State's argument necessarily focused almost exclusively on the extraneous bad acts to supply the requisite felonious intent because there is no evidence associated with the drafts to support the State's position. Finally, there is the obvious fact that the jury apparently could not agree (despite essentially identical evidence existing for the issuance and dishonor of each draft) that Wirth engaged in unlawful activities as to all of them. After reviewing all of this evidence in detail and studying the trial record diligently, we find legally

insufficient evidence to support the jury's conclusion that Wirth intentionally or knowingly issued the drafts without the intent to honor them.

We reverse the conviction and render a judgment of acquittal.

Bailey C. Moseley
Justice

Date Submitted:     April 20, 2011
Date Decided:       April 21, 2011

Publish

21